## NICHOLAS v. HOLDER.

**No. 12314.**

Court of Civil Appeals of Texas.
San Antonio.
Nov. 7, 1951.

Rehearing Denied Dec. 5, 1951.

[redacted]

[redacted]

[redacted]

[redacted]

J. F. Carl, W. G. Perkin and Kelley, Looney, McLean & Littleton, Edinburg, for appellant.

Rankin, Kilgore & Cherry, Edinburg, for appellee.

NORVELL, Justice.

This is a suit for breach of promise to marry. On November 1, 1949, Dr. W. F. Nicholas, the defendant in this case, was divorced from his wife on the grounds of cruel treatment. Article 4629, § 1, Vernon's Ann.Civ.Stats. His remarriage to any person other than his former wife was proscribed by Article 4640, which provides that: "Neither party to a divorce suit, where a divorce is granted upon the ground of cruel treatment, shall marry any other person for a period of twelve months next after such divorce is granted, but the parties so divorced may marry each other at any time. In all other cases either party may marry again after the dissolution of the marriage."

Dacia Holder, the plaintiff below and appellee here, alleged that:

"On or about the first day of November, 1949, shortly after the Defendant was divorced from his former wife, the Defendant promised and agreed to marry the Plaintiff and Plaintiff promised and agreed to marry the defendant. Plaintiff and Defendant at once began to make plans for their marriage. They agreed to wait a few months because the Defendant was a Doctor of Dentistry and he feared that his professional reputation and his standing and his business might be impaired if he married too quickly after his divorce.

"In January, 1950, Plaintiff and Defendant agreed to be married on January 28. At this time they told friends of their engagement and made arrangement with two

of their friends to go with them to Mexico on January 28, since they planned to be married in Mexico. * * *

"On the night of January 25th, 1950, the Defendant told the Plaintiff for the first time that he could not and would not marry her on January 28th. He told her that he thought it was too soon after his divorce for them to be married. Plaintiff reluctantly and in great disappointment and in humiliation at the necessity of explaining the postponement to friends who knew their plans, agreed to such postponement and defendant agreed and again promised that they would be married after a little more time had passed.

"Plaintiff and Defendant continued to see each other from time to time and Defendant renewed his promise to marry and repeatedly reassured the Plaintiff that they would be married within a few weeks or months, until the 18th day of February when the defendant harshly and angrily and in the presence of some of his friends told her that he was not going to marry her, that he did not want to see her again and ordered her off his premises."

The jury found (1) that "during November or December, 1949, January or February, 1950, the defendant, W. F. Nicholas, agreed to marry the plaintiff, Mrs. Dacia Holder"; (2) that during said four named months the defendant agreed to marry the plaintiff in January, 1950, in Mexico; (3) *"that during January 1950, or February, 1950, the defendant, W. F. Nicholas, agreed to marry the plaintiff at the expiration of one year from the date of his divorce from his former wife."* The remaining issues related to damages and judgment was rendered for plaintiff and against the defendant upon the verdict for $5,654.78, after the filing of a small remittitur.

 The case turns upon the jury's answer to Special Issue No. 3, which is admittedly not covered by the pleading. An agreement to marry within one year after the divorce, whether in the United States or in Mexico, or in some other foreign country, is unenforcible as being contrary to the public policy of the State as declared by Article 4640, above quoted. On the other hand, if the agreement were not to be performed within the space of one year from the making thereof, no liability could attach thereto because of the provisions of the statute of frauds. Article 3995, § 5, Vernon's Stats. In order to recover then, plaintiff is asserting an unpleaded contract which she says avoids the bar of both statutes, i. e., an agreement made in January or February of 1950 to be married after November 1, 1950, which was over one year after the date of the defendant's divorce, and yet within one year after the promise was made.

It is asserted that any possible objection to Special Issue No. 3, because of a deficiency in pleading has been waived. We may assume this to be true, but there remains the question of the sufficiency of the evidence to support the finding.

Mrs. Holder testified that she and Dr. Nicholas entered into an agreement to be married shortly after the doctor was divorced. No definite time was set but it is inferable that a reasonably short time was contemplated by the parties. Shortly thereafter a definite time and place was set. It was contemplated that the marriage would take place on January 28, 1950, at Saltillo, Mexico.

Later, according to Mrs. Holder, the plans for this marriage were cancelled. Her testimony, relied upon to support the jury's answer to the third special issue, is as follows:

"Q. When did you first learn that he was not going to marry you in Mexico on January 28th? A. On January 25th.

"Q. How did he go about telling you that? A. He just said that he was still afraid of his wife, what she might do and that he would rather wait a while, that people expected so much more from a professional man that he would rather wait a while longer, he would rather wait until the first of November, 1950, which would mean twelve months *unless he would change his mind in the meantime* he said.

"Q. Did you consent to such postponement? A. Yes, I did.

"Q. When he said that he was afraid of his first wife, you mean his former wife whom he had divorced? A. Yes.

"Q. Did you still believe that he still intended to marry you at a later time? A. Yes.

"Q. Did you continue to believe that up until the time he himself got married? A. No, I did not believe that after February 18th."

On February 18th, the parties had a quarrel which brought to an end all plans for marriage.

The original contract, made shortly after the divorce, was unenforcible for the reasons pointed out, and when Mrs. Holder's testimony above set out is analyzed, it will be seen that nothing was done or agreed upon which would render the same enforcible. Possible action of the doctor's divorced wife was discussed in considering a postponement of the marriage date. The date, November 1, 1950, one year after the date of the divorce, was also mentioned, but this was coupled with a proviso that the doctor could or might change his mind in the meantime. There was no set and definite agreement to be married upon a date certain which was one year removed in time from the date of the divorce. A new agreement to marry is not indicated by the testimony but rather an indefinite postponement of the date set for a marriage previously agreed upon. The date of marriage was not set by the agreement, according to Mrs. Holder's testimony, but, on the contrary, was left to be determined by Dr. Nicholas at any date before or after November 1, 1950.

We hold that there is no evidence supporting the jury's answer to Special Issue No. 3. However, we need not rest our decision alone upon the ground that Mrs. Holder's testimony does not support the jury's answer to the third special issue, as we have come to the conclusion that under Article 4640, any agreement to marry some one other than the divorced spouse which is entered into within one year after a divorce granted on the grounds of cruel treatment is unenforcible regardless of whether the date of performance be set at less than one year or more than one year after the date of the divorce.

It is legal for a man to marry another woman after the death of his wife, yet, at common law, agreements by a married person to marry another after the death or divorce of a spouse were denounced as being contrary to public policy. In Paddock v. Robinson, 63 Ill. 99, 14 Am.Rep. 112, the Court said: "This was an action for a breach of promise of marriage. On the trial, the court, against the objection of defendant, permitted the plaintiff to prove promises of marriage made at a time when both parties were married and known to be so by each other.[1] We cannot understand how an action can be maintained on such a promise. It cannot be performed except upon the death or divorce of the husband of the one party, and the wife of the other; and to hold that it is valid because it may be performed in such a contingency, would be to introduce into social life a dangerous and immoral principle. Only in the most corrupt condition of society could such agreements be tolerated as lawful. They are, in themselves, a violation of marital duty, and the persons who make them are morally unfaithful to the marriage tie. A contract so deeply at war with the best interests of social life, and which can nei-

1. This is not a case where one has contracted with a married person under the belief that he was not married. Mrs. Holder testified that she began going with Dr. Nicholas while he was separated from but not divorced from his wife. Mrs. Holder had been married four times and one of these marriages, later followed by divorce, took place after she had met Dr. Nicholas, some time in 1948. With reference to an occurrence in Feb-

ruary, 1950, Mrs. Holder testified as follows:

"Q. At the time of this incident there when you went to the office, didn't you tell Dr. Nicholas that you would see that you would get even with him for that? A. No, sir, but I did say, 'That after the way you have treated me today, I believe you are guilty of every cruel deed your wife accused you of.' She had gotten a divorce on the ground of cruel treatment."

ther be proposed on the one side nor listened to on the other without a consciousness of moral wrong—a contract, too, incapable of performance except upon a contingency so remote as not to be expected, and which it is a sin to anticipate for such a purpose—such a contract should certainly not be recognized as valid in a court of justice."

■ It seems clear that the purpose of Article 4640 is to encourage the remarriage of persons who have been divorced because of cruel treatment as defined by Article 4629, § 1. Article 4640 expressly provides that in all other cases either party may marry again after the dissolution of the marriage. Five grounds for divorce in addition to cruel treament are set forth in Article 4629, but a remarriage of the parties after a divorce granted on any of these grounds would be unlikely. Remarriage of the parties after a divorce granted for cruel treatment was not so regarded by the Legislature and such action was consequently encouraged.

The effect of the Legislative action was to extend the common law public policy rule so as to make it applicable for a period of one year after a divorce was granted on the ground of cruel treatment. We find no other purpose sought to be served by the statute. It was not intended to operate as a punishment to either party. No distinction is made between the innocent party and the guilty one in a "cruel treatment" divorce case as the ban of the statute is applicable to both.

■ If then the purpose of the statute be to foster the remarriage of divorced persons, one to the other, would not an agreement entered into within a one-year period militate against the end sought to be served by the statute, even though the contemplated marriage ceremony was not to take place until the expiration of a year after the date of the divorce? We believe that it would and consequently such agreements should be declared invalid.

■ The Supreme Court of Oregon in Vnuk v. Patterson, 118 Or. 602, 247 P. 766, 768, 47 A.L.R. 394, in construing a statute similar to the Texas statute (Article 4640) here involved, arrived at the conclusion that agreements to marry enentered into within the proscribed period were invalid even though not to be performed until after the expiration of such time. The Oregon statute provides that "neither party (to the divorce) shall be capable of contracting marriage with a third person," while our statute provides that "neither party to a divorce suit, where a divorce is granted upon the ground of cruel treatment, shall marry any other person for a period of twelve months * * *." In view of the public policy of the common law and the obvious purpose of the Texas statute, the distinction between the words, "neither party shall be capable of contracting marriage" and "neither party * * * shall marry" is deemed an insufficient basis for distinguishing this case from the sound conclusions reached by the Oregon Court. In construing a statute, particularly one designed to foster a certain public policy, all the provisions of the statute must be considered, and a narrow verbal construction should not be permitted to vitiate the public policy obviously sought to be served.

■ Appellee has cited the cases of Harpold v. Doyle, 16 Idaho 694, 102 P. 165; Morgan v. Muench, 181 Iowa 719, 156 N. W. 819, and J. P. Leininger Lumber Co. v. Dewey, 86 Neb. 659, 126 N.W. 87, as supporting a position contrary to that above stated. We have carefully considered these decisions but are of the opinion that the rule stated in Vnuk v. Patterson, 118 Ore. 602, 247 P. 766, 47 A.L.R. 394, is the better public policy rule and, as above pointed out, we are not inclined to seize upon differences in statutory wording in order to support a contrary view. We believe that to recognize as valid an agreement to marry entered into within a year after divorce, although to be performed after such period had expired would effectively defeat the public policy of the statute and invite testimony tailored to fit the rather unusual requirements of a statute so construed and the provisions of the statutes of frauds. Legislative public policy when clearly apparent should not be rendered impotent by overrefined verbal distinctions.

318

Appellee's cases relating to consummated marriages are obviously not in point as they relate to another and different public policy.

The judgment of the trial court is reversed and judgment here rendered for the appellant.